[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The defendants have moved for a directed verdict which they have agreed shall be treated as a Motion for Dismissal for Failure to Establish a Prima Facie Case in view of the parties agreement to try the issue of liability to this court.
The plaintiff's decedent died on October 30, 1996, of cancer which had metastasized from the tongue to various body parts to include the breast, neck, and lung. The defendant otolaryngologist (a principal in the defendant medical group) first saw the decedent on August 22, 1994, at which time he observed a tongue lesion but no ulceration or leukoplakia (though he was then aware Dr. Sherman, the decedent's general dentist, and/or Dr. Berger, the decedent's dental surgeon. had on earlier visits seen the same and though he told the patient on that date leukoplakia was often a frightening precursor of carcinoma). Defendant Bouteneff then believed the lesion was traumatic in origin, having been caused by the plaintiffs tongue rubbing in the open spaces created between teeth in the course of extensive dental restoration. He next saw the patient on October 7, 1994, at which time he felt the lesion was healing nicely and appeared smaller than it had in August though there was still a little crevice in the lesion. The doctor was then "quite convinced" there was no malignancy. The patient next returned on March 3, 1995, with complaints of difficulty moving her tongue and slurring her words. Because the lesion had not yet healed, because he then observed leukoplakia in the area of the lesion, and because the source of the irritation had been removed, (Mrs. Beverages braces had been replaced with bridge-work), the defendants level of concern grew and he did a biopsy which led to the diagnosis of carcinoma.
The plaintiff claims the defendants failure to biopsy the lesion on any date prior to March 3, 1995, and the resulting delay in treatment caused the disease to progress, deprived her of a chance for successful treatment of the disease, and denied or decreased her chance for survival.
The defendants claim the plaintiff failed to prove: 1) Cancer was present prior to March of 1995 and, therefore, that any failure to diagnose proximately caused the damages alleged; and CT Page 3794 2) The decedent more probably than not would have survived had Dr. Bouteneff's negligence not occurred.
Viewed in the light most favorable to the plaintiff, expert testimony established the defendant doctor deviated from the applicable standard of care in failing to do a biopsy on any date prior to March 3, 1995, and thereby was negligent. Having established such negligence, it is then the plaintiffs burden to demonstrate on the basis of reasonable medical probability the necessary causal relation between that deviation and the claimed injury. It is axiomatic that if no malignancy existed before March 3, 1995, the failure to biopsy in August or October of 1994 or on any date prior to March 3, 1995, — while negligent — could not have proximately caused the plaintiffs damages.
Dr. G. Paul Laursen, an otolaryngologist who testified as an expert witness for the plaintiff in a video disposition, stated the defendants "failure did result in the progression of the disease, and had it been treated appropriately and treated earlier, diagnosed earlier and treated correctly, that she would more likely than not be living today." T. p. 170. The same expert testified that, though he felt the patient probably needed a biopsy on August 22, 1994, he felt it best the defendant "court" the patient then (in view of the decedents having earlier expressed to both Dr. Sherman, her general dentist, and Dr. Berger, her dental surgeon, a reluctance to undergo a biopsy) and that such courting of the patient on that date was within the applicable standard of care. Dr. Laursen concluded it was a deviation not to do a biopsy on October 7, 1994. Dr. Alvin Katz, another otolaryngologist who testified for the plaintiff as an expert, stated the failure to biopsy in August or October knowing an identifiable lesion had been observed by Dr. Sherman on July 21, 1994, "contributed" to Mrs. Beverages death. T., p. 69. Such testimony falls short of the need to establish through competent evidence the claimed deviation proximately caused the injuries. As to whether a carcinoma existed either in August or October, Dr. Katz offered that was probably so. T., p. 56. In his view, "[A] non-healed lesion of a tongue is a malignant lesion unless proven otherwise. There is no way visually to prove a lesion being benign versus malignant, or malignant versus benign without doing a biopsy in a lesion that has not healed." T., p. 20. He continued, "A lesion that doesn't heal in a period of two to four weeks is carcinoma until proven otherwise. That's an accepted principle in our society." T., p. 72. Thus, the doctor speaks of CT Page 3795 a presumptive diagnosis which can only be confirmed — or "proven" — by biopsy.
No better evidence of the onset of this malignancy was established by either expert. Though Dr. Katz agreed the lesion described in the pathology report prepared at the time of the excisional biopsy on March 14, 1995, identified a T1 carcinoma, the earliest stage of the disease, he opined an August biopsy, had it been done, would probably have changed her chances of survival. T., p. 84. A presumptive diagnosis of cancer until proven otherwise falls short of the legal standard of proof. Likewise an assumption that the lesion shown by biopsy to be malignant in March of `95 must necessarily have been malignant in August or October of `94 misses the marks because unsupported by any scientific or medical findings. Had it been the case, for example, that the pathologist who reviewed the March, 1995, specimen described the cells he observed as sufficiently mature to permit the inference a carcinoma was present in August or October of 1994, the requisite causal relation between the deviation and claimed injury would have been established.
The evidence proffered with regard to loss of chances for successful treatment and/or survival again presumes a malignancy pre-existed the biopsy in March and would have been confirmed by an earlier biopsy had one been done. An additional infirmity, however, exists regarding this claim. Dr. Katz testified "a lesion diagnosed within two months of its onset has probably a sixty-five to seventy percent (65%-70%) five year survival. A lesion diagnosed more than two months from its onset, and progressively thereafter, precipitously drops to less than twenty percent (20%), so-so a large percentage of better result, better outcome, better quality of life, the earlier a diagnosis is made." T., p. 61. Assuming arguendo an earlier biopsy would have shown a malignancy, to conclude the failure to biopsy earlier cost the decedent her loss of change is to require the trier of fact to speculate that, between the date of the earlier biopsy and the March. 1995, biopsy, the malignancy would have grown in size or otherwise changed in its physical characteristics so as to reduce the likelihood for successful treatment. The evidence clearly established a lesion was present on July 21, 1994, when the decedent saw Dr. Sherman. Dr. Sherman testified to his opinion it had existed for some time. Is the trier of fact to speculate the lesion seen in July was not
a carcinoma despite the dentists observation it was sore and red and inflamed, that it had raised borders and was cratered CT Page 3796 in the middle, and that he then felt it had the potential for malignancy? Alternatively, is the trier of fact to speculate that, if a malignancy existed in July, it did not pre-exist Mrs. Beverages first appointment with the defendant longer than two months so as to conclude on the basis of Dr. Katz's testimony this patient — in August — had a sixty-five to seventy percent (65-70%) chance of five year survival? If in fact the malignancy existed more than two months prior to August 22, 1994, where along the continuum of survival potential was the decedent when first seen by the defendant? Pertinent to this inquiry is Dr. Laursen's testimony he believed cancer existed in early 1994. In this case, the evidence failed to remove the last chance claim from the realm of conjecture. See, Wallace v. St. FrancisHospital, 44 Conn. App. 257 (1997).
Finally, Dr. Laursen testified the defendants failure to employ other treatment modalities — i.e., radiation. — resulted in the spread of the disease and ultimately Mrs. Beverages death. T. p. 102. It was that doctors opinion the cancer had already spread to her neck when the biopsy was performed in March of 1995. T., pp. 102-103. He testified had radiation then occurred the cancer "would have stopped at that level." T., p. 103. Yet, on cross-examination. Dr. Laursen conceded he was not qualified as an expert on the growth rates of dancer and no evidence of survival rates was offered when, as Dr. Laursen testified, metastases had already occurred at first diagnosis. Further, Dr. Laursen undermined his testimony that the failure to radiate in March deprived the patient of a last chance when he stated, "We end up perplexed with cancers in that . . . like we discussed already, that some of the cancers we treat, we treat them adequately and people go on to die with them. We treat others minimally and they get better." T., p. 165. The trier of fact is here also left to surmise.
In determining whether to grant this motion, the court considers whether sufficient facts were proved to make out a prima facie case. "The evidence offered by the plaintiff is to be taken as true and interpreted in the light most favorable to him, and every reasonable inference to be drawn in his favor."Hinchliffe v. American Motors Corporation, 184 Conn. 607, 609-610
(1981). If, at the end of its case in chief, the plaintiff fails to sustain its burden of proof as to the allegations of its cause of action, the motion must be granted. Rosenfield v. Cymbala,43 Conn. App. 83, 91 (1996). CT Page 3797
The motion to dismiss is granted.
SHEEDY, J.